IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Barbara Manning, | ) | |
| | ) | Civil Action No. 6:12-2577-SB-KFM |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

       This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

       The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

       The plaintiff filed an application for disability insurance benefits ("DIB") on August 25, 2008, alleging that she became unable to work on December 31, 2007. The application was denied initially and on reconsideration by the Social Security Administration. On September 10, 2009, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Carroll H. Crawford, an impartial vocational expert,

---

    [1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

    [2]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

appeared on February 9, 2010, considered the case *de novo*, and on July 30, 2010, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied review on July 10, 2012.  The plaintiff then filed this action for judicial review.

In making her determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through June 30, 2011.

(2)    The claimant has not engaged in substantial gainful activity since December 31, 2007, the alleged onset date (20 C.F.R §§ 404.1571 *et seq*).

(3)    The claimant has the following severe impairments: osteoarthritis with degenerative joint disease; asthma;  chronic pancreatitis; neuropathy; chronic pain disorder; gastrointestinal disorder; vision disorder [slightly reduced vision]; depression; anxiety; and alcohol use (20 C.F.R. § 404.1520(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a).  I specifically find that the claimant can:  lift or carry up to 10 pounds occasionally and less than 10 pounds frequently; she can stand or walk for four hours out of an eight hour work day; sit for six hours out of an eight hour work day

2

and must have the option to sit or stand, defined as follows: she must be allowed to sit or stand consistent with the exertional limits I have described; cannot be off task more than five percent of the time; cannot leave the workstation; can stand or walk in up to one to two minute time segments each hour, and any additional standing or walking is consistent with the exertional limits; and she can push or pull with bilateral upper extremities on a frequent basis and use foot controls bilaterally on an occasional basis. Claimant can occasionally climb stairs and ramps; but never climb ladders, ropes, or scaffolds. She can frequently balance. She cannot crouch. She can stoop for one-half of the work period (quantified as four hours out of eight). Claimant can occasionally kneel or crawl. She can do fingering [fine manipulation][items no smaller than a paper clip] bilaterally on a frequent basis. Claimant can work at a video monitor on an occasional basis. She must avoid concentrated exposure to extremes of cold and heat. She must also avoid environmental irritants [e.g. fumes, odors, dusts, and gases], poorly ventilated areas, and chemicals. She must also avoid concentrated exposure to hazards [e.g., use of moving machinery, exposure to unprotected heights]. Claimant's work is limited to simple, routine and repetitive tasks performed in a work environment free of fast-paced production requirements and involving only simple work-related decisions with few, if any, work place changes. She is limited to occupations which do not involve the handling, sale, or preparation of alcoholic beverages.

(6)    The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7)    The claimant was born on November 15, 1963, and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. § 404.1563).

(8)    The claimant has a limited education and is able to communicate in English (20 C.F.R. § 404.1564).

3

(9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2; and compare Rules 201.18, 201.19, and 201.20).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569 and 404.1569(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2007, through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

4

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and

5

requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a  verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was born on November 15, 1963.  She went to the 10th grade in school, but was in special education classes (Tr. 47, 165, 218).  She has past relevant work as a housekeeper, waitress, warehouse packer, and cashier.  The plaintiff alleges disability commencing December 31, 2007, at which time she was 44 years old.  She was 46 years old on the date of the ALJ's decision.

From December 31, 2007, through January 6, 2008, the plaintiff was hospitalized for gastroenteritis and dehydration.  While in the hospital, she was also diagnosed with uncontrolled hypertension, elevated liver function tests, allergic reaction to antibiotics, B-12 and folate deficiency, microcytic anemia, anxiety disorder, and obesity. The plaintiff received IV fluids and adjustments to her medications.  It was noted that she

6

had a reaction to Ativan, causing visual hallucinations and agitation. She was discharged with instructions to adhere to a cardiac diet, begin daily walking exercises, and lose weight (Tr. 239). The plaintiff was advised to follow up with Dr. Jane Wasson, her primary care physician (Tr. 239-42).

In April 2008, the plaintiff presented to an orthopedist, Dr. Frank Phillips, complaining of pain and swelling in her left knee. Upon physical examination, the plaintiff showed mild intrinsic tightness in her hands, with no gross sensory changes in either hand; full motion in her shoulders; and symmetrical motion in her hips. Dr. Phillips noted "trace effusion" from a large Baker's cyst in the plaintiff's left knee; however, the plaintiff had full extension in the left knee, with flexion to 120 degrees, and only mild pain in her meniscus. The plaintiff's right knee showed "trace" signs of instability in the anterior cruciate ligament, with full extension and flexion (Tr. 252). A contemporaneous X-ray of the left knee revealed mild diffuse narrowing, which Dr. Phillips diagnosed as "mild degenerative arthritis with possible rheumatoid component" (Tr. 252). A left-knee MRI confirmed the plaintiff's Baker's cyst and revealed a lateral meniscal tear, osteoarthritic changes, and chondromalacia[3] (Tr. 275-76). Dr. Phillips noted that tests for rheumatism were "basically negative," but recommended arthroscopic knee surgery based on the MRI results (Tr. 251).

In May 2008, the plaintiff underwent the arthroscopic procedure without complication (Tr. 272-73). Eight weeks after surgery, Dr. Phillips noted that the plaintiff had full extension, near-full flexion, and "no real effusion." He encouraged her to work on her knee exercises (Tr. 248).

On July 16, 2008, Dr. Wasson found the plaintiff had a depressed affect and was anxious. Dr. Wasson's impression was hypertension, depression, asthma, and chronic pancreatitis. Dr. Wasson prescribed Paxil and Ultram (Tr. 335-39).

---

[3] "Chondromalacia" is the "softening of the articular cartilage, most frequently in the patella." *Dorland's Illustrated Medical Dictionary* 344 (29th ed. 2000).

In September 2008, the plaintiff complained of upper abdominal pain and underwent a series of laboratory tests to rule out pancreatitis. Aside from signs of mild gastroesophageal reflux and "some subcutaneous abdominal wall edema," the results were unremarkable (Tr. 264-68). Later that month, the plaintiff returned to Dr. Phillips complaining of pain and "feelings of giving way" in her left knee. Physical examination revealed "1+ effusion," "positive patellar grind," and "fairly quick[]" quadriceps fatigue, but full extension and near-full flexion. Dr. Phillips opined that the plaintiff was "under-rehabilitated" and stressed to her the importance of daily physical therapy (Tr. 362). He also noted that the plaintiff had a positive Antinuclear Antibodies ("ANA") test in April 2008 (Tr. 227, 362).

On October 1, 2008, Dr. Wasson noted that Ultram was not helping the plaintiff's pain and that her left knee was still "swollen, big, and tender." The plaintiff also complained of anxiety and depression (Tr. 330-34).

In March 2009, the plaintiff returned to Dr. Phillips complaining of bilateral knee pain. X-rays showed "significant medial compartmental arthritic changes" and "some patellofemoral findings," but Dr. Phillips noted "no gross instability" in the plaintiff's knees (Tr. 361). In July 2009, Dr. Phillips evaluated the plaintiff for reported knee pain and numbness in both hands (Tr. 360). The plaintiff had good grip strength and negative Tinel's and Phalen's signs,[4] with "a little bit of intrinsic tightness in both hands" and tenderness in her left elbow and both knees. Dr. Phillips noted mild synovitis in both knees,[5] with full extension and flexion to 130 degrees. He reiterated his concern about the plaintiff's earlier positive ANA test and speculated that it might indicate "inflammatory arthropathy" (Tr. 360)

---

[4] Tinel's and Phalen's sign tests are commonly used by physicians to diagnose carpal tunnel syndrome. *See Simmons v Commissioner of Soc. §.*, No. BPG-10-2135, 2011 WL 3880413, at *3 n. 4 (D.Md. Aug. 3, 2011).

[5] Synovitis is the clinical term for "inflammation of the synovial membrane, usually that of a joint." *See Stedman's Medical Dictionary* 1734 (26th ed. 1995).

8

In May 2009, Dr. Wasson referred the plaintiff to a rheumatologist, Dr. Muthamma Machimada, to address her elevated ANA levels (Tr. 359). Upon examination, Dr. Machimada observed no evidence of synovitis in the plaintiff's distal interphalangeal joints, wrists, elbows, ankles, metatarsophalangeal joints, and only trace synovitis in her second to fifth proximal interphalangeal joints and her metacarpophalangeal joints. The plaintiff's elbows and knees were tender to palpation, but she showed no signs of tenderness in her spine. Her range of motion was intact in her shoulders and hips. Dr. Machimada added Mobic to the plaintiff's other pain medications (Tr. 357).

In June 2009, Dr. Machimada noted that a battery of laboratory tests for rheumatism and lupus had produced negative results. The plaintiff reported not receiving relief from Mobic and that most of her pain was in her neck and lower back. She also reported numbness from her shoulders down her bilateral upper extremities and numbness from her knees down. Dr. Machimada switched the plaintiff's prescription for Mobic to Voltaren (Tr. 352-54). X-rays of the plaintiff's cervical and lumbosacral spine showed mild foraminal narrowing and moderate degenerative disc disease at C5-6, and minimal spondylosis at L3 (Tr. 348-50).

On July 1, 2009, Dr. Phillips evaluated the plaintiff for severe bilateral knee pain, numbness in both hands, and stocking glove type numbness and pain in her left elbow. On examination, the plaintiff had a stocking glove decreased sensation in both hands involving the median, ulnar, and radial nerves. She had good grip strength. She had a little bit of intrinsic tightness in both hands, tenderness along the lateral epicondyle at the left elbow, and pain with resisted wrist extension. She was diffusely tender in both knees, left more so than the right, with a moderately positive patellar grind on the left and mildly positive patellar grind on the right. She had mild synovitis in each knee with full extension and flexion to 130 degrees. Dr. Phillips indicated that the plaintiff's X-rays showed significant medial compartmental wear, right more so than the left side. Dr. Phillips stated

9

that the plaintiff remained "symptomatic with her knees and also has multiple other joint aches, as well as the numbness in her hands." He expressed concern that the numbness in her hands was neuropathy, stating, "She did have a positive ANA before and appears to have some sort of inflammatory arthropathy." Dr. Phillips started the plaintiff on Naprosyn. (Tr. 360).

In July 2009, the plaintiff returned to Dr. Wasson complaining of joint pain in her elbows and shoulders, in addition to numbness in her fingers that caused her to "almost drop things" (Tr. 378). Dr. Wasson noted that the plaintiff exhibited normal pulses and good range of motion in all four extremities, with no edema (Tr. 381). The plaintiff also showed normal touch sensation and equal grip (Tr. 381). With respect to the plaintiff's reports of anxiety and depression, Dr. Wasson observed that the plaintiff's condition had improved with medication (Tr. 382).

In August 2009, the plaintiff presented to Dr. Machimada complaining of numbness in her wrists and hands and pain in her lower back, right shoulder, elbow, and knees. A physical examination revealed no evidence of synovitis in any of her joints. She was tender to palpation of her lower lumbar spine, but denied pain radiating down her legs (Tr. 386). Dr. Machimada prescribed Relafen and Ultram and instructed the plaintiff to report back in three months (Tr. 387-88).

**Consultative Examinations**

In December 2008, the plaintiff underwent a consultative physical examination with Dr. Frank Barnhill (Tr. 283-84). Dr. Barnhill noted that the plaintiff had poor vision with "early cataract changes"; appeared "a little anxious but not very depressed"; had "pretty good" mentation; had 2+ deep tendon reflexes, 4/5 motor function, and intact and symmetric sensation in all four extremities; walked with a very slight right limp; could stand on heels and toes; could stoop, bend, and touch her toes; had a negative Romberg's sign, drawer sign, and straight-leg raising test; had no tightness or tenderness in her paraspinal

10

muscles or legs; had normal joints in her upper extremities; had 4/5 grip strength in both hands; could reach above her head, behind her head, and behind her back; had some knee swelling and diffuse tenderness, but no effusion; and showed no lateral or medial instability. Dr. Barnhill also noted "a few scattered, dry crackles" in the plaintiff's lungs, with "scattered inspiratory wheezing" (Tr. 284). Dr. Barnhill assessed the plaintiff with (1) reasonably controlled hypertension; (2) moderately severe asthma with wheezing at rest; (3) probable exertional respiratory difficulty; (4) visual deficit; (5) osteoarthritis in both knees, status post-arthroscopy; and (6) peptic ulcer disease with upper gastrointestinal bleed, which had apparently resolved (Tr. 284). Dr. Barnhill opined that "it would be difficult for [the plaintiff] to maintain active employment because of her shortness of breath. It was obvious after walking down the hallway she got very short of breath with respiratory rate increasing up to 26. It took about 15 minutes for that to return to normal." He recommended further evaluation of the plaintiff's eyes and pulmonary function, as well as a mental evaluation for stress-induced depression (Tr. 284).

In January 2009, an optometrist, Dr. Norden Davis, examined the plaintiff's eyes and assessed her vision with corrective lenses at 20/40 in each eye (Tr. 286). In February 2009, the plaintiff underwent pulmonary function testing, which yielded "satisfactory" results (Tr. 289-91). A subsequent pulmonary function test in April 2009 showed "mild airway obstruction" and "reduced lung volumes" (Tr. 320).

### State Agency Physician Opinions

In February 2009, State agency physician Dr. George Chandler reviewed the plaintiff's medical records and opined that she could occasionally lift or carry up to 20 pounds; frequently lift or carry up to ten pounds; sit, walk, or stand for up to six hours in an eight-hour workday; and do limited pushing or pulling with her lower extremities (Tr. 306-13). Dr. Chandler also opined that the plaintiff could frequently balance, stoop, and crouch; could occasionally climb ramps or stairs, kneel, or crawl; could never climb ladders, ropes,

11

or scaffolds; and should generally avoid concentrated exposure to extreme temperatures and air pollutants (Tr. 308-10). He recommended limiting the plaintiff to frequent bilateral fingering of objects, citing Dr. Barnhill's finding of mildly decreased (4/5) grip strength (Tr. 309). In July 2009, a second State agency physician, Dr. Hugh Clarke, affirmed Dr. Chandler's assessment (Tr. 373).

In February 2009, a State agency psychologist, Dr. Gary Calhoun, reviewed the plaintiff's medical records and determined that she did not have a severe mental impairment, notwithstanding her reported anxiety and depression (Tr. 292-305). Dr. Calhoun indicated mild limitations with respect to the plaintiff's activities of daily living; ability to maintain social functioning; and ability to maintain concentration, persistence, or pace, with no episodes of decompensation (Tr. 302). He also concluded that the plaintiff's mental limitations did not meet the criteria for Listing 12.04 (affective disorders) (Tr. 292, 303). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. In July 2009, a second State agency psychologist, Dr. Debra Price, reviewed the record and affirmed Dr. Calhoun's assessment (Tr. 372).

### *Medical Source Statements*

On August 18, 2009, Dr. Phillips completed a questionnaire in which he opined that the plaintiff could not "engage in anything more than sedentary work" and would have pain "with all activities at anything more than sedentary level" (Tr. 374).[6] In October 2009, he provided a supplemental statement that the plaintiff's chronic arthritis in her knees would limit her to "sedentary work at best, with sedentary work defined as being able to stand or walk no more than 2 hours out of an eight hour work day." Dr. Phillips also opined that the plaintiff "would experience frequent interruptions to her concentration from her

---

[6] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." *See* 20 C.F.R. § 404.1567(a). Sedentary jobs also require occasional walking and standing, which generally totals no more than two hours in an eight-hour workday. *Id*.; SSR 96-9p, 1996 WL 374185, at *3.

knees hurting." He stated that he had also observed inflammation in the plaintiff's left wrist, but had not treated her for that ailment (Tr. 395). In December 2009, Dr. Phillips completed a second questionnaire that expressed the plaintiff's physical limitations in terms of percentages of an eight-hour workday (Tr. 397-98). Specifically, he opined that the plaintiff could use her hands for simple grasping, fine manipulation, or keyboarding only 10 percent of the workday; could not use arm/leg controls or do any work that involved any reaching; could bend for 20 percent of the day; could balance for 10 percent; could not stoop at all; and required a cane for 80 percent of the time (Tr. 397). The medical findings he cited to support his assessment were diagnoses of lupus (based on the plaintiff's positive ANA test) and arthritis (based on X-ray and MRI results) (Tr. 398). Dr. Phillips also opined that pain associated with the plaintiff's "probable lupus" would limit her ability to concentrate by interfering with abstract tasks 50 percent of the time; precluding all but one- or two-step simple tasks 20 percent of the time; precluding any attention to work tasks 70 percent of the time; and requiring assistance 40 percent of the time. He indicated that his opinion reflected the plaintiff's limitations as of March 2009 (Tr. 398).

On September 21, 2009, Dr. Wasson authored a narrative report in which she described the effects of the plaintiff's combined impairments: asthma, anxiety, depression, alcohol abuse, pancreatitis, neuropathy, vitamin deficiencies, anemia, hypothyroidism, degenerative joint disease in the left knee, obesity, thoracic scoliosis, and the potential side effects of pain medication (Tr. 375-76). Dr. Wasson noted that the plaintiff's pancreatitis, vitamin deficiencies, depression, and anxiety had improved after the plaintiff stopped abusing alcohol and remarried, but opined that nausea associated with the plaintiff's lingering pancreatitis would periodically affect her ability to concentrate on a job that requires making judgments or carrying out more than simple one- or two-step tasks. She also opined that the plaintiff's "mild to moderate" asthma would cause her to miss work if it "flar[ed] up," adding that the plaintiff's smoking may cause "more bronchitis and wheezing"

13

(Tr. 375-76). Dr. Wasson opined that the plaintiff's obesity exacerbated her knee pain, which "would probably limit her to sedentary work." She speculated that thoracic scoliosis "might present a problem" if the work requires sitting for extended periods, but she could not say to what extent (Tr. 376). Dr. Wasson also stated that the plaintiff's ability to concentrate could be compromised by the burning sensation that she periodically experienced in her legs due as a result of her neuropathy, which was "likely a lasting result of her past history of alcohol abuse" (Tr. 375-76).

On September 30, 2009, clinical psychologist Dr. James Ruffing conducted a psychological evaluation of the plaintiff at her counsel's request (Tr. 389-94). Although testing showed that the plaintiff read only at a second-grade level, Dr. Ruffing noted that the results were "of questionable validity" in light of the plaintiff's ability to complete an intake questionnaire; her school records reflecting good grades in reading in seventh grade; and certain responses that suggested the plaintiff was capable of reading newspaper articles, instruction manuals, or inventory lists (Tr. 393-94). Dr. Ruffing expressed doubt that the plaintiff was functionally illiterate, instead diagnosing her with dysthymic disorder (Tr. 394).

***Plaintiff's Testimony***

At her February 2010 hearing, the plaintiff testified that she stopped working as a housekeeper in 2007 because she had trouble with her breathing and blood pressure, had painful swelling and weakness in her legs, and could not bend (Tr. 52-53). She testified that the pain was located "from my knees all the way up . . . . All up my thighs down" (Tr. 53). She reported that she could lift up to five pounds and could stand for 20 to 30 minutes before needing to rest and elevate her legs (Tr. 54, 63). The plaintiff testified that she could sit for 30 minutes before succumbing to pain that ran from her mid-back down to her buttocks, occasionally radiating down her legs (Tr. 54-55). She was capable of reaching over her head to get something from a shelf, but could not bend over to tie her shoes (Tr. 64). She said that her back pain was "about as bad as my knee pains" and

14

sometimes made it difficult to sleep (Tr. 55). Pain medications helped, but made her drowsy, prompting her to take a two-hour nap twice per day. The plaintiff testified that she had tried to exercise to reduce the stress on her back, but could not because of her asthma (Tr. 55-56). She reported that she had cut back considerably on her cigarette smoking, but that the reduction had not helped her breathing. She also complained of numbness in her hands, which prevented her from holding objects such as a mug or a pen and required her to wear a brace on her left wrist (Tr. 57). She added that she suffered from occasional nausea, which she had last experienced the month before the hearing (Tr. 63). She reported that her vision problems were the result of a "birth defect," but she had no problems reading the print in a newspaper or magazine or driving an automobile during the daytime (Tr. 69-70).

The plaintiff further testified that she bathed and dressed herself, shopped for groceries, did a little cooking and cleaning, and had a driver's license (Tr. 58-60, 63). She said that she was placed in special education classes for reading in school, and that it "takes [her] a while to read" newspapers or magazines (Tr. 61). She told doctors that she liked to read for enjoyment, but testified that she cannot read a book from start to finish and must rely on pictures (Tr. 62).

The plaintiff testified that her impairments affect her concentration, allowing her to focus on things for no more than ten minutes (Tr. 65). The plaintiff testified that she uses pictures to read (Tr. 60-62). She testified that her depression and anxiety had improved with treatment and medication and that she felt "pretty good" (Tr. 67, 71-72). She stated that she "get[s] paranoid when I'm around a lot of people," but that it had not affected her previous work because she typically worked by herself or with one or two people. She socialized with family, but not friends, and sometimes went to the movies (Tr. 67-69).

*Vocational Expert Testimony*

The ALJ asked the vocational to consider a hypothetical individual, with the same age, education, and work history as the plaintiff, who had the following work-related limitations:

> Lift or carry up to 15 pounds occasionally and 10 pounds frequently; stand/walk for up to four hours and sit for up to six hours of an eight-hour workday, with the option to alternate between sitting and standing; cannot be off-task for more than five percent of the workday; cannot leave the workstation; can stand/walk in one- to two-minute segments every hour, with additional standing/walking consistent with the exertional limitations above; can frequently push or pull with bilateral upper extremities, and occasionally push or pull with bilateral lower extremities; can occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds; can frequently balance, and can stoop for up to four hours in an eight-hour workday; can occasionally kneel and crawl, but not crouch; can finger items no smaller than a paper clip frequently with both hands; can occasionally work with a video monitor; must avoid concentrated exposure to extreme temperatures, environmental irritants, poorly ventilated areas, chemicals, and hazards such as moving machinery and unprotected heights; must avoid handling alcoholic beverages; can perform only simple, routine, repetitive work, with no fast-paced production requirements and few changes in the workplace.

(Tr. 75-77).

The vocational expert testified that such an individual could not perform the plaintiff's past work, but could perform sedentary, unskilled jobs as an assembly worker (5,200 jobs statewide; 350,000 nationwide), bench hand (1,200 jobs statewide; 84,000 nationwide), and hand trimmer (1,800 jobs statewide; 156,000 nationwide) (Tr. 77-78). Although the sit/stand option was not reflected in the *Dictionary of Occupational Titles*

16

("*DOT*"), on which the vocational expert primarily relied, he testified that, based on his 30 years of experience in the field of vocational rehabilitation, the added limitation would not affect the number of jobs available in the three occupations he identified (Tr. 80-81).  In response to a second hypothetical proposing essentially the same limitations identified above, but with exertional requirements strictly consistent with the regulatory definition of sedentary work, the vocational expert testified that all three occupations would accommodate such limitations (Tr. 78-79).  He also testified that someone who could not sustain sufficient concentration to perform even simple, routine, repetitive tasks would be incapable of full-time work (Tr. 79).

Upon examination by the plaintiff's counsel, the vocational expert testified that the three occupations he identified would not require the ability to read; however, all three occupations would be precluded if a hypothetical individual with the plaintiff's vocational profile were limited to only occasional grasping and fine manipulation with both hands (Tr. 82).  Further, the vocational expert testified that a requirement that the individual elevate her legs for 20 percent of the workday would likely pose a problem with respect to the bench hand position, but would not affect the other two positions (Tr. 83).  He testified that the work would be precluded if the individual were required to sit and stand for no more than 20 minutes at a time, with one- to two-minute periods of rest between shifting positions (Tr. 83-84).  It would also be precluded if the individual could not pay attention to any work tasks at all for two hours out of an eight-hour workday (Tr. 85-86).

## ANALYSIS

The plaintiff argues the ALJ erred by:  (1)  failing to fully support his credibility determination; (2)  failing to give proper weight to the opinion of Dr. Phillips; and (3)  failing

to consider the combined effects of her impairments.[7]  She further argues that the Appeals Council erred in failing to consider "new and material" evidence submitted after the ALJ's decision, which purportedly supports manipulative limitations beyond those reflected in the ALJ's residual functional capacity ("RFC") assessment.

### *Credibility*

The plaintiff argues that the ALJ failed to properly assess her credibility.  The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process.  First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . .  It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565.  However, the court

---

[7]In her initial brief, the plaintiff also argued that the ALJ failed to properly consider the effects of obesity on her other impairments (pl. brief at pp. 26-27).  However, in her reply, the plaintiff withdrew consideration of this issue in light of cases cited by defense counsel (pl. reply at pp. 11-12).

in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> > While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

The ALJ's credibility finding was as follows:

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. The claimant, as is pointed out in my discussion of the objective medical evidence, has overstated her impairments, and her complaints of reduced functional limitations, which would render her disabled, are not supported by that evidence.

(Tr. 34).

The plaintiff argues that the ALJ's failure to set out the required evidentiary support for his credibility finding requires remand.  This court agrees.  The Commissioner argues that the ALJ's "thorough discussion of the medical evidence" highlights inconsistencies in the plaintiff's allegations, and "[a]lthough the ALJ did not explicitly state the manner in which each particular functional limitation that Plaintiff alleged was inconsistent with the evidence, his analysis was 'sufficiently specific to make clear' his reasons for discounting Plaintiff's statements" (def. brief at p. 16).  The Commissioner goes on to provide a list of evidence supporting the ALJ's adverse credibility determination (*id.* at pp. 16-18).  However, as argued by the plaintiff, even assuming the Commissioner's analysis may be correct, the ALJ did not provide any discussion of the evidence upon which he relied in making his credibility determination.  Accordingly, the Commissioner's arguments are post-hoc rationalization.  *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from

21

advancing grounds in support of the agency's decision that were not given by the ALJ.").

As set forth above, Social Security Ruling 96-7p states that the ALJ's decision "must contain

specific reasons for the finding on credibility, supported by the evidence in the case record

and must be sufficiently specific to make clear to the individual and to any subsequent

reviewers the weight the adjudicator gave to the individual's statements and reasons for that

weight." 1996 WL 374186, at *4.  Without the ALJ's analysis, it is impossible to determine

whether the credibility finding is based upon substantial evidence.

Based upon the foregoing, upon remand, the ALJ should be instructed to set

forth his reasons and evidence relied upon in assessing the plaintiff's credibility in

accordance with the above-cited law.

### Treating Physician

The plaintiff next argues that the ALJ improperly discounted Dr. Phillips'

opinions regarding her functional limitations (pl. brief at pp. 18-26).  The regulations require

that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b),

and, unless a treating source's opinion is given controlling weight, weighed according to the

following non-exclusive list:  (1) the examining relationship; (2) the length of the treatment

relationship and the frequency of the examinations; (3) the nature and extent of the

treatment relationship; (4) the evidence with which the physician supports his opinion; (5)

the consistency of the opinion; and (6) whether the physician is a specialist in the area in

which he is rendering an opinion. 20 C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See

also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a

patient is "disabled," "unable to work," meets the listing requirements, or similar assertions

are not medical opinions.    These are administrative findings reserved for the

Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927].  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

On August 18, 2009, Dr. Phillips completed a questionnaire in which he opined that the plaintiff could not "engage in anything more than sedentary work" and would have pain "with all activities at anything more than sedentary level" (Tr. 374).  On October 26, 2009, he provided a supplemental statement that the plaintiff's chronic arthritis in her knees would limit her to "sedentary work at best, with sedentary work defined as being able to stand or walk no more than 2 hours out of an eight hour work day."  Dr. Phillips also opined that the plaintiff "would experience frequent interruptions to her concentration from her knees hurting."  He stated that he had also observed inflammation in the plaintiff's left wrist, but had not treated her for that ailment (Tr. 395).  On December 21, 2009, Dr. Phillips completed a second questionnaire that expressed the plaintiff's physical limitations in terms of percentages of an eight-hour workday (Tr. 397-98).  Specifically, he opined that the plaintiff could use her hands for simple grasping, fine manipulation, or keyboarding only 10 percent of the workday; could not use arm/leg controls or do any work that involved any

23

reaching; could bend for 20 percent of the day; could balance for 10 percent; could not stoop at all; and required a cane for 80 percent of the time (Tr. 397).  The medical findings he cited to support his assessment were diagnoses of lupus (based on the plaintiff's positive ANA test) and arthritis (based on X-ray and MRI results) (Tr. 398).  Dr. Phillips also opined that pain associated with the plaintiff's "probable lupus" would limit her ability to concentrate by interfering with abstract tasks 50 percent of the time; precluding all but one- or two-step simple tasks 20 percent of the time; precluding any attention to work tasks 70 percent of the time; and requiring assistance 40 percent of the time.  He indicated that his opinion reflected the plaintiff's limitations as of March 2009 (Tr. 398).

The ALJ found as follows with regard to Dr. Phillips opinions:

> Insofar as Dr. Phillip's assessment of functional limitation to sedentary work is concerned, I have given it significant weight because that portion of his opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence in the record.

> However, I have given little weight to his percentage ratings contained in the questionnaire dated December 21, 2009. Initially, I note that my assessment of functional limitations is not expressed in percentage ratings (unlike worker's compensation and VA ratings). Secondly, Dr. Phillips's percentage ratings are based upon claimant's reports of pain to him, and I have found the claimant less than credible in her reports of such limitations at the hearing. Given that his percentage ratings are based upon the claimant's subjective reports, I have given them little weight. I also find that the entire objective medical evidence of record, as I have discussed it, does not support Dr. Phillips's percentage ratings. Dr. Wasson's opinion, discussed immediately below, also contradicts those ratings.

(Tr. 32-33).

The plaintiff specifically takes issue with the ALJ's observations that (1) Dr. Phillips' December 2009 questionnaire was not expressed in useful terms; (2) Dr. Phillips' ratings were based on the plaintiff's subjective complaints of pain, which the ALJ had discounted; and (3) the ratings were unsupported by and inconsistent with objective medical evidence in the record (pl. brief at pp. 21-25).

As argued by the Commissioner, it does not appear that the ALJ rejected Dr. Phillips' opinion because it was in a percentage-rating format. He simply noted that the format was not readily translatable into an RFC assessment. However, with regard to the ALJ's rejection of Dr. Phillips' ratings because they were based upon the plaintiff's subjective complaints, the undersigned has found that the ALJ failed to properly assess the plaintiff's credibility. Furthermore, the ALJ did not cite the "objective medical evidence" that conflicted with Dr. Phillips' ratings, and he did not state what inconsistencies existed between Dr. Phillips' ratings and Dr. Wasson's opinion. Accordingly, upon remand, the ALJ should be instructed to reconsider Dr. Phillips' December 2009 questionnaire in light of the foregoing.

### Combination of Impairments

The plaintiff next argues that ALJ failed to properly evaluate the combined effects of her multiple impairments. *See* 20 C.F.R. §§ 404.1526(b)(3), 416.926(b)(3) ("If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing."). When, as here, a claimant has more than one impairment, the ALJ must consider the severe and nonsevere impairments in combination in determining the plaintiff's disability. Furthermore, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). It "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity.... [T]he [Commissioner] must

25

consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* (citing *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir.1985)).  The ALJ's duty to consider the combined effect of the plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability determination process." 20 C.F.R. §§ 404.1523, 416.923.

       The Commissioner argues that because the ALJ gave significant weight to the opinion of treating physician Dr. Wasson, who considered the plaintiff's asthma, anxiety, depression, alcohol abuse, pancreatitis, neuropathy, degenerative joint disease, obesity, vitamin deficiencies, anemia, hypothyroidism, thoracic scoliosis, and the potential side effects of pain medication (Tr. 375-76) in finding that the plaintiff could do sedentary work, the ALJ properly considered the combined effect of the plaintiff's impairments (def. brief at pp. 24-25 (citing *Bryant v. Astrue*, No. 1:11-cv-03083, 2013 WL 1303127, at *14 (D. Md. Mar. 28, 2013) (noting that ALJ properly considered combined effect of claimant's impairments where ALJ relied on medical opinions that incorporated all of claimant's multiple impairments)).  However, as the undersigned finds that remand is appropriate for the reasons discussed above, the ALJ should be further instructed upon remand to explain his evaluation of the combined effects of the plaintiff's severe and non-severe impairments.

### Appeals Council Evidence

       Lastly, the plaintiff argues that the Appeals Council erred in failing to consider certain "new and material" evidence submitted after the ALJ's decision, which she alleges supports manipulative limitations beyond those reflected in the ALJ's RFC assessment (pl. brief at pp. 29-35).  She cites three items of evidence in particular:  (1)  a November 2010 nerve conduction study showing "mild right carpal tunnel syndrome" (Tr. 467-68); (2)  June 2011 examination notes by Dr. Carol Kooistra of Carolina Neurology noting the plaintiff's complaints of bilateral hand numbness (Tr. 463-64); and (3)  Dr. Kooistra's December 2011 opinion that it would "be best" to limit the plaintiff's fine manipulation and handling of objects

to an occasional basis during an 8 work day; it would be best to limit gross manipulation and handling of objects to an occasional basis; and it would be best to limit activities such as writing and typing to an occasional basis (Tr. 400; *see* pl. brief at pp. 30-31).

In its July 10, 2012, denial of the plaintiff's request for review, the Appeals Council explained:

> We also looked at medical records from Upstate Carolina Medical Center dated September 9, 2010 through January 26, 2012, medical records and a questionnaire from Carol Kooistra, M.D. dated November 9, 2010, June 29, 2011, and December 18, 2011, respectively. The Administrative Law Judge decided your case through July 30, 2010. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before July 30, 2010.
>
> If you want us to consider whether you are disabled after July 30, 2010, you need to apply again.  We are returning the evidence to you to use in your new claim.

(Tr. 2).

As stated by the United States Court of Appeals for the Fourth Circuit in *Wilkins v. Secretary, Dept. of Health and Human Services*, 953 F.2d 93 (4th Cir. 1991):

> Because the Appeals Council denied review, the decision of the ALJ became the final decision of the Secretary. *Russell v. Bowen*, 856 F.2d 81, 83–84 (9th Cir.1988); *see* 20 C.F.R. § 404.955 (1991). "Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the Secretary's decision is supported by substantial evidence." *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir.1972); *see* 42 U.S.C.A. § 405(g).

*Id*. at 96.

As noted above, the evidence at issue here was found by the Appeals Council to be relative to "a later time" and was returned to the plaintiff (*see* Tr. 2). The plaintiff complains that the evidence from Dr. Kooistra was not made part of the record and states that she has "attached the proffered evidence to the motion to amend the record "(pl. brief at p. 38). The court docket shows that the plaintiff has not filed a motion to amend the record. However, on January 22, 2014, the Commissioner filed a supplement to the administrative record, which contains the evidence submitted to the Appeals Council (*see* doc. 24).[8]

The plaintiff argues that the new evidence is material in that Dr. Kooistra's opinion contains specific information based on diagnostic testing showing that she is more limited than the ALJ found in the RFC analysis[9] and that she cannot perform the constant or frequent handling and fingering that is required by the jobs identified by the ALJ (pl. brief at pp. 30-34; *see* Tr. 400, 463-64, 467-68). Since the undersigned recommends that the decision be reversed and remanded for other reasons as set forth above, the undersigned further recommends that, upon remand, the ALJ should be instructed to consider the record as a whole, including the new evidence, in making his determination at each step of the sequential evaluation process.

---

[8]In her brief filed on May 21, 2013, the Commissioner referred to the supplemental administrative transcript pages containing the new information submitted to the Appeals Council (*see* def. brief at pp. 25-29) but did not file the supplement until January 2014.

[9]The ALJ found that the plaintiff could "do fingering [fine manipulation][items no smaller than a paper clip] bilaterally on a frequent basis" (Tr. 31).

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 23, 2014
Greenville, South Carolina

29